**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. Commodity Futures Trading Commission,** | ) ) ) |
| **Plaintiff,** | ) ) **Docket No.  16-cv-7544** |
| | ) Jury Trial Demanded |
| **v.** | ) ) |
| **eFloorTrade, LLC and John A. Moore,** | ) ) ) |
| **Defendants.** | ) ) ) ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES**
**UNDER THE COMMODITY EXCHANGE ACT**

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

### I.      SUMMARY

1.      From at least until October 2010 to at least October 2015 ("Relevant Period"), defendant eFloorTrade, LLC ("EFT") failed to keep and produce for inspection full, complete, and systematic records of all transactions relating to its business in dealing in commodity interests (specifically, commodity futures contracts) in violation of Section 4g(a) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6g(a) (2012) and Regulations 1.31(a)(1) and (2), 17 C.F.R. § 1.31 (a)(1) and (2) (2013), and Regulations 1.35(a)(1) and (3), 17 C.F.R. § 1.35(a)(1) and (3) (2013).

2.      During the Relevant Period, EFT failed to prepare a written record of a customer order immediately upon receipt of that order including the account identifier and an order number and record thereon with a timestamp, to the nearest minute, of the date and time the

order was received in violation of Section 4g(a) of the Act,7 U.S.C. § 6g(a) (2012) and Regulation 1.35(b), 17 C.F.R. § 1.35(b) (2013).[1]

3.     Specifically, EFT failed to keep and produce for inspection the trading instructions it electronically received for customers who subscribed to third party trading systems for which EFT provided execution services.  EFT also failed to prepare a written record of the customer orders that it placed (filled, unfilled or canceled) as a result of the trading instructions received, timestamped with the date and time to the nearest minute of when an order was received.  In addition, EFT failed to keep all emails relating to its business in dealing in commodity interest transactions.  For example, Moore's wife, who acted in the capacity of a compliance officer for EFT during the Relevant Period, used her personal email account to send and receive emails related to EFT's business of transacting commodity interest transactions and these emails were not kept and maintained by EFT.  Accordingly, these failures violated the recordkeeping requirements of the Act and Regulations set forth above in paragraphs 1 and 2.

4.     Defendant John Moore ("Moore") is a registered associated person ("AP"), designated as the Branch Office Manager of EFT's main office in Orlando and is responsible for supervising EFT's employees and agents in all aspects of their business duties.

5.     During the Relevant Period described herein, EFT and Moore failed to diligently supervise the handling of customers' trading accounts by EFT employees and agents. Specifically, EFT and Moore failed to ensure that policies and procedures were in place to make

---

[1] Although Regulations 1.31 and 1.35 were amended several times during the Relevant Period, these recordkeeping Regulations that are the subject of the violations alleged herein, existed in substance throughout the Relevant Period [see paragraphs 45, 47-49 and 56 of the complaint], with the exception of the Regulation 1.35(a)(1) which, in substance, was amended to include the requirement to keep communications such as quotes, solicitations, bids, offers, instructions, trading and prices that lead to the execution of a transaction in a commodity interest whether communicated by electronic mail, mobile device or other digital or electronic media.  This amendment came into effect on January 2, 2013 [see paragraph 46 of the complaint].

and keep books and records that EFT is required to make and keep as a Commission registrant and failed to adopt adequate procedures on how to handle its customers' margin deficiencies. For example, contrary to the Act and Regulations, EFT's procedures did not require EFT's offices utilizing the firm's electronic trading platform and/or the trading software provided by the FCM carrying that customer's account to make or maintain written records such as customer order tickets with order numbers and timestamps.  EFT and Moore also failed to ensure all employees and agents followed internal policies and procedures established by EFT that required EFT to sever its business relationship with a third party trading system provider when the carrying firm ceased doing business with that provider.  These supervision failures violated Regulation 166.3, 17 C.F.R. § 166.3 (2015) and also contributed to recordkeeping violations of the Act and Regulations.

6.      In sworn testimony before the Commission on September 18, 2015, in his role as managing director, majority owner, registered AP and sole principal of EFT, Moore was questioned about the books and records EFT makes and keeps in its ordinary course of its business in dealing in commodity interests.  In response to such questioning, Moore falsely testified under oath that he or another EFT employee working under his direct supervision, created and maintained spreadsheets relating to trades executed on behalf of customers whose orders were generated from trading instructions received from third party trading system providers.  Moore knowingly or reasonably should have known that this sworn testimony to the Commission was false and misleading, since Moore and EFT through their attorney subsequently admitted that no such records were made or kept by EFT.  Moore's actions violated Section 6(c)(2) of the Act,  7 U.S.C. § 9(2) (2012) which makes it illegal for any person to make a false or misleading statement of material fact to the Commission if the person knew, or reasonably

3

should have known the statement to be false or misleading.

7.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act,

7 U.S.C. § 13a-1 (2012), to enjoin Defendants' unlawful acts and practices and compel their

compliance with the Act and Regulations.  In addition, the CFTC seeks civil monetary penalties,

disgorgement and such other equitable relief as this Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act,

7 U.S.C.  § 13a-1(a) (2014), which authorizes the CFTC to seek injunctive relief against any

person whenever it shall appear that such person has engaged, is engaged, is engaging, or is

about to engage in any act or practice constituting a violation of any provision of the Act or any

rule, regulation, or order thereunder.

9.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act,

7 U.S.C. § 13a1(e) (2014), in that Defendants have transacted and/or transact business in this

District and Defendants' acts and practices in violation of the Act and Regulations occurred, are

occurring, and/or are about to occur within this District.  Defendants had and/or have customers

who reside within this District who have subscribed to third party trading systems for which EFT

provides trade execution services.

## III.      THE PARTIES

10.      Plaintiff **U.S. Commodity Futures Trading Commission** is an independent

federal regulatory agency charged by Congress with the responsibility for administering and

enforcing the provisions of the Act, 7 U.S.C. §§ 1 et seq. (2014), and the Regulations

promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (2015).

11.     Defendant **eFloorTrade, LLC** is a Delaware limited liability company whose main office is located at 255 S Orange Ave #1505, Orlando, Florida.  EFT is a family business, wholly owned and operated by Moore and members of his immediate family.  EFT provides trade execution services to customers located throughout the United States, including those who reside in this District.  EFT has been registered with the Commission as an introducing broker ("IB") since April 3, 2000 (including a period during which it did business under the name Floor Trade, Inc.).

12.     Defendant **John A. Moore** resides in Orlando, Florida.  Moore has been registered with the Commission as an AP of EFT since April 2000 and listed as its sole principal. Moore functions as EFT's Chief Compliance Manager, Sales Supervisor, and is responsible on a daily basis for reconciling prior day's executed transactions, ensuring EFT is accurately paid commissions for the orders it places on behalf of its customers behalf, calculating required net capital, and overseeing that day's trading.  He is listed as the Branch Manager of the main office in Orlando and is responsible for supervising EFT's employees and agents in all aspects of their business duties.  He has been registered with the Commission as an AP and principal with various Commission registrants since August 1988.

## IV.     FACTS

**A.     EFT's Business**

13.     The majority of EFT's business involves receiving trading instructions from third party trading systems and placing buy and sell orders for commodity interest transactions on behalf of its customers who have subscribed to certain third party trading systems.  These customers have granted EFT a letter of direction to place orders communicated by third party

trading system providers on their behalf and EFT charges customers a commission per transaction for its execution services.

14.     EFT electronically receives trading instructions for its customers through TradeStation, an electronic trading platform, from third party trading systems.  These instructions will include the specific futures contract to be traded, type of order (limit or market), and a stop price.  For example, on July 30, 2011, Think LX Pro trading system from the system provider Tradethink sent instructions at 8:10:48 am to buy at market, the September 2011 British Pound futures contract traded on the CME, a board of trade located in the United States, with a stop price of 1.6524.  Moore also receives a text to his mobile phone with trading instructions from certain trading systems.  Moore and EFT failed to save any of these texts of trading instructions.

15.     EFT built software which receives these trading instructions to buy or sell a specific futures contract and routes them on behalf of its customers to the futures commission merchant ("FCM") carrying that customer's account for execution.

**B.    Commission's Document Requests**

16.     On March 11, 2014 and October 23, 2015, the Division of Enforcement (the "Division") requested, through a letter sent to Defendants' then attorney, that EFT produce for inspection to the Division in its Eastern Regional Office in New York, New York, certain of the books and records that EFT was required to make under the Act and Regulations. The books and records requested were within the five year period that these records were required to be kept under the Act and Regulations.

17.     As part of its March 11, 2014, the Commission requested production of, among other things, (i) written documentation of EFT's operating policies or procedures, (ii) all reviews

performed since January 1, 2012, to ensure compliance with EFT's written policies and

procedures, (iii) account documentation for accounts over which EFT had a power of attorney,

letter of direction or otherwise granted permission to exercise trading authority over a customer's

account, including but not limited to account opening documents, order tickets and account

statements, (iv) trading signals, performance results or written documentation relating to any

electronic trading system or trading platform for which EFT has trading authority pursuant to a

power of attorney, a letter of direction or was otherwise granted permission to trade, and (v) all

customer complaints or inquires received between January 1, 2012 and the date of the request

and the results of EFT's investigation of those customer complaints or inquires.  The

Commission also requested all account records, trading records, and correspondence and

litigation records relating to a lawsuit filed by a customer against EFT.

18.     In response to the Commission's request for documents dated March 11, 2014,

EFT produced certain of the requested documents, but failed to provide any (i) trading signals

relating to any electronic trading system or trading platform for which EFT has trading authority

pursuant to a power of attorney, a letter of direction or was otherwise granted permission to

trade, and (ii) order tickets made by EFT as a result of the receipt of the trading signals.

19.     As part of its request for documents dated October 23, 2015, the Commission

again requested the production of all "documents not previously produced to the Division which

are responsive to the Division's previous request dated March 11, 2014 request."  In addition, the

Commission also requested the production of, among other things, (i) trading instructions or

signals received from a third party trading system specifying any commodity interest to be

bought or sold for a subscriber's account, (ii) documents created or received when EFT executes

transactions for a subscriber following the trading instructions or signals received from a third

party trading system.  Such documents may include, but are not limited to, order tickets, trade

listings, trade confirmations, daily trade logs, customer complaints, or inquiries, (iii) documents

maintained by EFT documenting the execution of orders placed on behalf of customers who had

given EFT authorization to follow the trading instructions or trading signals of a third party

trading system, and (iv) any spreadsheet or other record created or maintained by EFT

documenting the trades it placed on behalf of customers who had given EFT authorization to

follow the trading instructions or trading signals of a third party trading system.

20.     On November 12, 2015, Defendants responded to Commission's document

request dated October 23, 2015 through a letter sent by Defendants' attorney ("Defendants'

Letter") which produced certain documents, but failed to produce any of the documents

responsive to the Commission's request described above in paragraph 18.  For those requests that

Defendant failed to produce documents, the Defendants' Letter provided a written response to

the Division's request.

21.     Defendants' attorney acted as Defendants' agent in submitting the Defendants'

Letter to the Division.  Because the attorney was retained by Defendants, the attorney was acting

on behalf of the Defendants in making statements in the Defendants' Letter.  In addition, the

Defendants' Letter stated that it was responding to a request sent to Defendants by the Division

seeking additional information from EFT.  Further, Moore, on behalf of both EFT and himself,

provided the information in the Defendants' Letter to the attorney and reviewed the contents of

the Defendants' Letter prior to it being sent to the Division.

22.     In response to the Division's October 23, 2015 document request, the Defendants

stated in the Defendants' Letter that "[w]hen EFT executes transactions for subscribers of third

party trading systems, no document is created or received."  Defendants also stated in the

Defendants' Letter that "EFT does not maintain any documents regarding the handling of trade orders, other than the procedures manual" for customers who had given EFT authorizations to follow the trading instructions or trading signals of a third party trading system. The Defendants further stated in the Defendants' Letter that "EFT does not create or maintain any spreadsheets relating to trades placed in accordance with a third party trading systems."

### C.   Moore's Testimony Under Oath

23.   On September 18, 2015, Moore appeared voluntarily before the Commission to provide testimony under oath. He was represented by counsel. Prior to the start of his testimony, Moore was provided with a document titled "Statement to Persons Providing Information about Themselves to the Commodity Futures Trading Commission" (the "Statement") which sets forth his legal rights and responsibilities as a person requested to supply information voluntarily or as a person with recordkeeping obligations under the Act or Regulations. In relevant part, the Statement advised Moore of the following:

> "Any person who knowingly and willfully makes false or fraudulent statements, whether under oath or otherwise, or falsifies, conceals or covers up a material fact, or submits any false writing or document, knowing it to contain false, fictitious or fraudulent information, is subject to the criminal penalties set forth in 18 U.S.C. § 1001 . . .
>
> It shall also be unlawful for any person to make any false or misleading statement of a material fact to the Commission . . . or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading, as set forth in Section 6(c)(2) of the Commodity Exchange Act, 7 U.S.C. § 9(2)."

24.   At the opening of the record, Moore was administrated an oath by the court reporter to testify truthfully and Moore swore or affirmed that he would testify truthfully. Under oath and on the record, Moore then acknowledged that he read the Statement and had no

questions regarding his legal rights and responsibilities. He also testified that there was no reason why he could not providing full, complete and truthful answers to the Division's questions.

25.     Moore testified that during the Relevant Period, he was the managing director, majority owner, registered AP, and sole principal of EFT. He further testified that he was responsible for adopting and enforcing internal policies and procedures to ensure EFT's compliance with the Act, supervising EFT's APs and employees and managing EFT's day to day operations. Moore also testified that as required by NFA rules, he reviewed EFT's operations on a yearly basis (according to the criteria set forth in NFA's self-examination questionnaire) and signed the questionnaire attesting to the fact that EFT's internal procedures were adequate to meet its regulatory responsibilities.

26.     Moore testified that he knew that his wife (who acted in the capacity of compliance officer for EFT during the Relevant Period) used her personal email account to send and receive emails related to EFT's business of transacting commodity interest transactions and that these emails were not kept and maintained by EFT. During the Relevant period, Moore's wife used her personal email address to correspond with at least one EFT customer and Moore listed his wife's personal email address in the annual registration updates he filed with NFA as the email address to use for any accounting or compliance issues related to EFT.

27.     Moore also testified that he and other employees and agents under his direct supervision did not make and/or keep a written record of the customer orders placed with the carrying FCM since they did not "have enough time in the day" to prepare records of customers' orders and relied on the records made by the carrying FCM since the FCM maintained "a history of time stamped orders when the order was received, filled, and hit the customer account."

10

Moore testified that since he could access relevant records through the FCM's website whenever he wanted, there was no need for EFT to keep copies of these records.  Notwithstanding Moore's testimony, the records of the carrying FCM, however, did not include the date and time when EFT received the trading instructions from the third party trading system, what those instructions were and the time when EFT placed the customer order with the carrying FCM.

28.    Moore was asked if the trading signals were maintained by EFT and he testified that the signals were displayed on a screen that EFT monitored and that these signals were only preserved "on occasion sometimes."  He further testified that the signals were captured in TradeStation but TradeStation had known "data discrepancy problems" and "futures contracts, when it [futures contracts] rolls, it [TradeStation] changes their data" so that TradeStation data isn't 100 percent accurate and changes."

29.    Moore further testified that he did not maintain the text messages containing the trading instructions he received on behalf of EFT's customers from third party system providers.

30.    Moore made a false or misleading statement when he testified that EFT made and kept an Excel spreadsheet listing the trades EFT placed on behalf of customers who subscribed to third party trading systems.  He also made a false or misleading statement when he testified that the Excel spreadsheet was the sole record EFT made and kept of the futures orders placed on behalf of customers who had given EFT authorization to follow the trading instructions or trading signals of a third party trading system.

> Question:    Other than what's currently in the TradeStation account that you are running, you don't separately maintain anything?
> Answer:    Yes, we do.
> Question:    How do you do that?
> Answer:    In an Excel spreadsheet.
> Question:    Whose responsibility is it to maintain that?

| | |
|---|---|
| Answer: | <u>Between my son and I we both; I do some, he does some</u>. |
| Question: | And how often do you do it? |
| Answer: | <u>Every day</u>. |
| Question: | Okay, let me step back. A signal was generated in [third party provider]'s system, you receive a text message; is that correct? |
| Answer: | Correct. |
| Question: | The signal also through your coding automatically places trades in your customers' accounts that are trading that system? |
| Answer: | Correct. |
| Question: | No separate order ticket or record is created outside the TradeStation environment at that point? |
| Answer: | The [FCM's] time stamp order in the customer's account. |
| Question: | But eFloorTrade doesn't create anything? |
| Answer: | No. |
| Question: | And eFloorTrade doesn't maintain anything? There is on the FCM side, but there is nothing on your side? |
| Answer: | <u>The Excel spreadsheet</u>. |
| Question: | And there is the signal in the system, in the TradeStation that generated a signal over to the FCM to execute the trades? |
| Answer: | Correct. |
| Question: | After that signal is done, how soon is that downloaded into the Excel spreadsheet? |
| Answer: | <u>The next day</u>. |

31.     When further questioned about the Excel spreadsheet (referenced in paragraph 30 above), Moore made a false or misleading statement when he testified that either he or his son "manually input in the spreadsheets those trading systems that signal the day before, make sure that those are the trades that went off" and reflected "the actual trade that occurred in the customer account" and that this spreadsheet was used by him to reconcile the prior business day's trading. Moore also made a false and misleading statement when he further testified that he reviewed this spreadsheet daily and ensured that copies of this spreadsheet were electronically maintained by EFT.

32.     Moore knew or reasonably should have known at the time of his testimony under oath that his statements about the Excel spreadsheet referenced in paragraphs 30 and 31 were false and misleading. Contrary to Moore's testimony, the Defendants' Letter states that "EFT

does not create or maintain any spreadsheets relating to trades placed in accordance with a third party trading systems" and that "[w]hen EFT executes transactions for subscribers of third party trading systems, no document is created or received." Moore's testimony is further contradicted by the Defendants' Letter which states that "EFT does not maintain any documents regarding the handling of trade orders, other than the procedures manual" for these customers.

**D.      Defendants' Failure to Properly Supervise**

33.      Moore is a registered AP of EFT, is designated as a Branch Office Manager and is a managing member, majority owner, and chief compliance officer of EFT.  As a registered AP and Branch Office Manager of EFT's main office, Moore is responsible for supervising all employees and agents, supervising sales solicitations, approving customer account forms, monitoring trading activity to detect unusual or suspicious activity, reviewing and responding to customer complaints, conducting training for staff and drafting EFT's written policies and procedures to ensure EFT complies with the Act and Regulations.  Moore reviewed EFT's operations on a yearly basis and had not identified any issues with EFT's policies or procedures. In fact, Moore signed NFA's annual self-examination questionnaire where he attested to the fact that EFT's written procedures were adequate to meet its regulatory responsibilities.

34.      EFT and Moore failed to design, implement, maintain, and enforce an adequate program of supervision to meet their regulatory obligations.  These supervision failures contributed to EFT's recordkeeping violations of the Act and Regulations.  For example, contrary to the Act and Regulations, EFT's procedures did not require EFT's offices utilizing the firm's electronic trading platform and/or the trading software provided by the FCM carrying that customer's account to maintain written records such as customer order tickets with preprinted

order numbers and timestamps.

35.     Another example of EFT and Moore's failure to design, implement, maintain, and enforce an adequate program of supervision is EFT's failure to adopt written procedures governing the handling of routine margin calls which occur when the carrying FCM demands additional funds or securities be deposited in a trading account because the value of equity in the account has fallen below a required minimum.  Moore only developed such procedures after it was sued by one of its customer for placing trades, not authorized by the customer and/or generated from a the third party trading system subscribed to by that customer, in that customer's account to avoid a margin call.

36.     EFT and Moore also failed to perform their supervisory duties diligently by not following the very procedures they had adopted.  For example, EFT had a provision in its Procedures and Operations Manual dated September 1, 2011, that "if an FCM ceases to do business with any third-party trading system, EFT will also sever the relationship" with that third-party trading system.  Notwithstanding this policy, when EFT was notified on September 15, 2011, that an FCM severed its relationship with a certain third party trading system and closed the accounts of EFT customers who subscribed to that system, EFT did not sever its relationship with that system.  Instead, EFT assisted those subscribers in opening accounts at another FCM so that they could continue to trade pursuant to that third party trading system. EFT violated its own policy so that it would not lose the commissions earned from subscribers to that particular system, which comprised the vast majority of EFT customers.  The next version of the compliance manual dated March 2, 2012, changed this policy and gave EFT discretion whether to terminate its business relationship with the third party trading system provider.

37.     EFT and Moore did not diligently oversee the activities of EFT employees and

14

agents under their supervision, nor did they act to ensure that employees under their supervision complied with the Act and Regulations.  Further, EFT and Moore did not enforce compliance with EFT's own policies and procedures.

## V.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**FALSE OR MISLEADING STATEMENT TO THE COMMISSION**
**(VIOLATIONS OF 7 U.S.C § 9(2))**

38.     The allegations of the foregoing paragraphs are incorporated herein by reference.

39.     Section 6(c)(2) of the Act provides in pertinent part that it is unlawful "for any person to make any false or misleading statement of a material fact to the Commission. . . or to omit to state in any such statement any material fact that is necessary to make any statement of material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading."  7 U.S.C. §9(2) (2012).

40.     As set forth above, Moore made false or misleading statements to the Commission when he was testified under oath before the Commission about the books and records EFT makes and keeps in its ordinary course of its business in dealing in commodity interests.  Moore also falsely testified that EFT made or kept an Excel spreadsheet listing the buy or sell orders placed to trade a specific futures contract on behalf of customers who subscribed to a third party trading system.  Moore further testified falsely when he testified that he used this Excel spreadsheet to reconcile the prior business day's trading and that he personally ensured that copies of this spreadsheet were electronically stored by EFT.

41.     Moore knew or reasonably should have known that each of his statements was false or misleading.

42.     Each false, fictitious, fraudulent or misleading statement of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(2) of the Act, 7 U.S.C. §9(2) (2012).

## COUNT TWO

**FAILURE TO KEEP AND PRODUCE REQUIRED BOOKS AND RECORDS**
**(VIOLATIONS OF 7 U.S.C § 4g(a) and 17 C.F.R. §§ 1.31(a)(1) and (2); 1.35(a)(1) and (3))**

43.     The allegations of the foregoing paragraphs are incorporated herein by reference.

44.     Section 4g(a) of the Act provides in pertinent part that every person registered as an IB shall keep books and records pertaining to transactions and positions of customers in such a form and for such period as may be required by the Commission; and shall keep such books and records open to inspection by any representative of the Commission or the United States Department of Justice.  7 U.S.C. § 6g(a) (2012).

45.     Regulation 1.35(a) provides in pertinent part that each IB shall keep full, complete, and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures.  Included among such records are all orders (filled, unfilled, or canceled), copies of confirmations, copies of statements of purchase and sale, and all other records, which have been prepared in the course of its business of dealings in commodity futures.  During the Relevant Period, this legal requirement existed as follows:

        a.      Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (with respect to conduct before October 1, 2012);

        b.      Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (as amended by Customer Clearing and Documentation Timing of Acceptance of Clearing and Clearing Member

Risk Management, 77 Fed. Reg. 21,278, 21,306 (Apr. 9, 2012)) (with respect to conduct on or after October 1, 2012 to January 2, 2013);

c.      Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. 66,288, 66,324 (Nov. 2, 2012)) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); and

d.      Regulation 1.35(a)(1), 17 C.F.R. § 1.35(a)(1) (2013) (with respect to conduct on or after February 19, 2013).

46.      Effective January 2, 2013, Regulation 1.35(a)(1) also provides in pertinent part that among the records required to be kept are all oral and written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading and prices that lead to the execution of a transaction in a commodity interest whether communicated by electronic mail, mobile device or other digital or electronic media.  17 C.F.R. § 1.35(a)(1) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps-Records of Transactions, 77 Fed. Reg. 75,523, 75,541 (Dec. 21, 2012)).

47.      Regulation 1.35(a) also provides in pertinent part that each IB shall retain the records required by this section in accordance with the requirements of Regulation 1.31, and produce them for inspection and furnish true and correct information and reports as to the contents or the meaning thereof, when and as requested by an authorized representative of the Commission.  During the Relevant Period, this legal requirement existed as follows:

a.      17 C.F.R. § 1.35(a) (2012) (with respect to conduct before October 1, 2012);

b.      Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (as amended by Customer Clearing and Documentation Timing of Acceptance of Clearing and Clearing Member

Risk Management, 77 Fed. Reg. at 21,306) (with respect to conduct on or after October 1, 2012 to January 2, 2013);

      c.      Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,324) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); and

      d.      Regulation 1.35(a)(3), 17 C.F.R. § 1.35(a)(3) (2013) (with respect to conduct on or after February 19, 2013).

48.      Regulation 1.31(a)(1) provides in pertinent part that all books and records required to be kept under the Act or by these regulations shall be kept for a period of five years from the date thereof and shall be readily accessible during the first 2 years of the 5-year period.  All such books and records shall be open to inspection by the Commission.  During the Relevant Period, this legal requirement existed as follows:

      a.      Regulation 1.31(a)(1), 17 C.F.R. § 1.31(a)(1) (2012) (with respect to conduct before January 2, 2013);

      b.      Regulation 1.31(a)(1), 17 C.F.R. § 1.31(a)(1) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,323) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); and

      c.      Regulation 1.31(a)(1), 17 C.F.R. § 1.31 (a)(1) (2013) (with respect to conduct on or after February 19, 2013).

49.      Regulation 1.31(a)(2) provides in pertinent part that Persons required to keep books and records by the Act or by these Regulations shall provide copies or originals of such records promptly.  During the Relevant Period, this legal requirement existed as follows:

      a.      17 C.F.R. § 1.31(a)(2) (2012) (with respect to conduct before January 2,

2013);

      b.      Regulation 1.31(a)(2), 17 C.F.R. § 1.31(a)(2) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,323)  (with respect to conduct on or after January 2, 2013 and before February 19, 2013); and

      c.      Regulation 1.31(a)(2), 17 C.F.R. § 1.31(a)(2) (2013) (with respect to conduct on or after February 19, 2013).

50.      EFT violated Section 4g(a) of the Act and Regulations 1.31(a)(1) and (2), and 1.35(a)(1) and (3) by failing to keep for a period of five years from the date thereof and to produce for inspection, full, complete, and systematic records of all transactions relating to its business of dealing in commodity futures, including but not limited to:  (1) trading instructions or trading signals received electronically from a third party trading system specifying any commodity interest to be bought or sold for a subscriber's account, (2) written order tickets for orders EFT placed on behalf of customers who had given EFT authorization to follow the trading instructions or trading signals of a third party trading system, (3) documents created or received when EFT executed transactions for a subscriber to third party trading systems (such as orders (filled, unfilled, or canceled), journals, ledgers, trade confirmations, purchase and sale statements, and customer complaints or inquiries), (4) spreadsheets or other record created or maintained by EFT documenting the trades executed for customers who had given EFT authorization to follow the trading instructions or trading signals of a third party trading system, (5)  all emails relating to its business in dealing in commodity interest transactions , and (6) other records prepared in the course of its business of dealings in commodity interests and related cash or forward transactions.

51.      Moore controlled EFT and did not act in good faith or knowingly induced,

directly or indirectly, the acts constituting EFT's violations alleged in this count.  Moore is therefore liable as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

52.     The foregoing acts, omissions, and failures of Moore and/or other EFT employees occurred within the scope of their employment, office or agency with EFT.  Therefore EFT is liable as a principal pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012) and Regulation 1.2, 17 C.F.R. § 1.2 (2015) for the acts, omissions, and failures of EFT's employees, officers and agents.

53.     Each record that was not kept in accordance with the Commission's Act and Regulations, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012), Regulations 1.31(a)(1), and (2), 17 C.F.R. § 1.31(a)(1) and (2) (2012) (with respect to conduct before January 2, 2013); Regulations 1.31(a)(1), and (2), 17 C.F.R. § 1.31 (a)(1) and (2) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,323) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); Regulations 1.31(a)(1), and (2), 17 C.F.R. § 1.31 (a)(1) and (2) (2013) (with respect to conduct on or after  February 19, 2013); Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (with respect to conduct before October 1, 2012); Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (as amended by Customer Clearing and Documentation Timing of Acceptance of Clearing and Clearing Member Risk Management, 77 Fed. Reg. at 21,306) (with respect to conduct on or after October 1, 2012 to January 2, 2013); Regulation 1.35(a), 17 C.F.R. § 1.35(a) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,324) (with respect to conduct on or after January 2, 2013 and before February 19, 2013); Regulations 1.35(a)(1) and (3), 17 C.F.R. § 1.35(a)(1) and (3)

(2013) (with respect to conduct on or after February 19, 2013).

## COUNT THREE

### FAILURE TO MAKE AND/OR PREPARE REQUIRED RECORDS
### (VIOLATIONS OF 7 U.S.C. § 4g(a) and REGULATION 1.35, 17 C.F.R. § 1.35)

54.     The allegations of the foregoing paragraphs are incorporated herein by reference.

55.     Section 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012), provides that every person registered as an IB "shall make such reports as are required by the Commission regarding the transactions and positions of such person, and the transactions and positions of the customer thereof, in commodities for future delivery on any board of trade in the United States or elsewhere."

56.     Regulation 1.35 specifically requires that each IB who receives a customer order shall immediately upon receipt thereof prepare a written record of the order including the account identification [except in certain circumstances related to bunched orders] and order number and shall record thereon, by timestamp or other timing device, the date and time, to the nearest minute, the order is received.  During the Relevant Period, this legal requirement existed as follows:

      a.     Regulation 1.35(a-1), 17 C.F.R. § 1.35(a-1) (2012) (with respect to conduct before October 1, 2012);

      b.     Regulation 1.35(a-1), 17 C.F.R. § 1.35(a-1) (2012) (as amended by Customer Clearing and Documentation Timing of Acceptance of Clearing and Clearing Member Risk Management, 77 Fed. Reg. at 21,306) (with respect to conduct on or after October 1, 2012 to January 2, 2013);

      c.     Regulation 1.35(b), 17 C.F.R. § 1.35(b) (2012) (as amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,325) (with respect to conduct on

or after January 2, 2013 and before February 19, 2013); and

        d.      Regulation 1.35(b), 17 C.F.R. § 1.35(b) (2013) (with respect to conduct on or after February 19, 2013).

57.      EFT violated Section 4g(a) of the Act and Regulation 1.35 when it failed to prepare, immediately upon receipt, "a written record of the order including account identification and order number" and "record thereon, by timestamp or other timing device, the date and time, to the nearest minute, the order is received" for its customers who subscribed to third party trading systems.

58.      Moore controlled EFT and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting EFT's violations alleged in this count. Moore is therefore liable as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

59.      The foregoing acts, omissions, and failures of Moore and EFT employees occurred within the scope of their employment, office or agency with EFT. Therefore EFT is liable as a principal pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012) and Regulation 1.2, 17 C.F.R. § 1.2 (2015) for the acts, omissions, and failures of EFT employees, officers and agents.

60.      Each record that was not properly made or prepared, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012), and Regulation 1.35(a-1), 17 C.F.R. § 1.35(a-1) (2012) (with respect to conduct before October 1, 2012); Regulation 1.35(a-1), 17 C.F.R. § 1.35(a-1) (2012) (as amended by Customer Clearing and Documentation Timing of Acceptance of Clearing and Clearing Member Risk Management, 77 Fed. Reg. at 21,306) (with respect to conduct on or after

October 1, 2012 to January 2, 2013); Regulation 1.35(b), 17 C.F.R. § 1.35(b) (2012) (as

amended by Adaptation of Regulations to Incorporate Swaps, 77 Fed. Reg. at 66,325) (with

respect to conduct on or after January 2, 2013 and before February 19, 2013); Regulation

1.35(b), 17 C.F.R. § 1.35(b) (2013) (with respect to conduct on or after February 19, 2013).

**COUNT FOUR**

**FAILURE TO DILIGENTLY SUPERVISE**
**(VIOLATIONS OF REGULATION 166.3)**

61.    The allegations of the foregoing paragraphs are incorporated herein by reference.

62.    Regulation 166.3, 17 C.F.R. § 166.3 (2015), requires each Commission registrant,

except an AP who has no supervisory duties, to diligently supervise the handling of all

commodity interest accounts carried, operated, advised or introduced by the registrant and all

other activities of its partners, officers, employees and agents relating to its business as a

Commission registrant.

63.    EFT and Moore were each registered with the Commission during the Relevant

Period.  During the relevant period, Moore had supervisory duties at EFT as a registered AP and

a Branch Office Manager of EFT's main office.  EFT and Moore violated Regulation 166.3, 17

C.F.R. § 166.3 (2015), in that they, among other things, did not diligently supervise the handling

of commodity interest accounts and all other activities of EFT's partners, officers, employees

and agents.  EFT and Moore failed to design, implement, maintain, and enforce an adequate

program of supervision to meet its regulatory obligations and these supervision failures

contributed to its recordkeeping violations of the Act and Regulations.

64.    Each failure to supervise, including but not limited to those specifically alleged

herein, is alleged as a separate and distinct violation of Regulation 166.3, 17 C.F.R. § 166.3

(2015).

## VI.    RELIEF REQUESTED

WHEREFORE, for the reasons stated above, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.    Find that Moore and EFT violated Section 4g(a) of the Act, 7 U.S.C. § 6g(a) (2012) and Regulations 1.31(a)(1) and (2), 17 C.F.R. § 1.31 (a)(1) and (2) (2013), and Regulations 1.35(a)(1) and (3), 17 C.F.R. § 1.35(a)(1) and (3) (2013) (including all predecessor Regulations applicable during the Relevant Period as alleged above in Count Two), and Regulation 1.35, 17 C.F.R. § 1.35 (2013) (including all predecessor Regulations applicable during the Relevant Period as alleged above in Count Three).

B.    Find that Moore also violated 6(c)(2) of the Act, 7 U.S.C. §9(2) (2012);

C.    Enter orders of permanent injunction enjoining each Defendant and his/its affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert or participation with the Defendants, who receive actual notice of such order by personal service or otherwise, from directly or indirectly violating Section 4g(a) 7 U.S.C. § 6g(a) and Regulations 1.31(a), 1.35(a) and (b), 166.3, 17 C.F.R. §§ 1.31(a), 1.35(a) and (b), and 166.3 (2016) and Moore from directly or indirectly violating Section 6(c)(2) of the Act, 7 U.S.C. § 9(2) (2012) .

D.    Enters orders of permanent injunction restraining and enjoining each Defendant and his/its affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him/it from directly or indirectly:

1)    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40)(2012));

2)      Entering into any transactions involving commodity interests for his/its own personal account or for any account in which he/its has a direct or indirect interest;

3)      Having any commodity interest traded on his/its behalf;

4)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)      Soliciting, receiving, or accepting any funds form any person for the purpose of purchasing or selling any commodity interests;

6)      Permanently revoking the registration of Defendants;

7)      Acting as a principal as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2015), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012), registered, exempted from registration, or required to be registered with the Commission as except as provided for in Regulation 4.41(a)(9), 17 C.F.R. § 4.41(a)(9) (2015);

E.      Enter an order directing each Defendant to pay a civil monetary penalty in the amount of the higher of $167,728 for each violation of the Act or Regulations committed or triple the monetary gain to each Defendant for each violation of the Act or Regulations described herein, plus post-judgment interest;

F.      Enter an order requiring Defendants to disgorge all benefits received from acts or practices that constitute violations of the Act and Regulations, including pre and post-judgment interest;

G.      Enter an order requiring Defendants to pay costs and fees as permitted by 28

U.S.C. §§ 1920 and 2412(a)(2); and

H.        Order such other and further remedial ancillary relief as the Court may deem

appropriate.


Date: _____                          Respectfully submitted,

                                               U.S. COMMODITY FUTURES
                                               TRADING COMMISSION


                                               By:__\s\ Karin N. Roth_____
                                                   Karin N. Roth
                                                   Senior Trial Attorney
                                                   kroth@cftc.gov

                                                   Steven I. Ringer
                                                   Chief Trial Attorney
                                                   sringer@cftc.gov

                                                   Manal M. Sultan
                                                   Deputy Director
                                                   msultan@cftc.gov

                                               Division of Enforcement
                                               140 Broadway, 19th Floor
                                               New York, New York 10005
                                               Phone: (646) 746-9700
                                               Fax: (646) 746-9940